# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| JOSEPH LAWRENCE LIGOS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0435-SG |
| HAIM TSUFF, MAX PRIDGEON, ASAF YARKONI, and NIR HASSON, | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  August 12, 2022
Date Decided:  November 30, 2022
Date Reissued:  December 1, 2022

Corinne Elise Amato, Kevin H. Davenport, Samuel L. Closic, and Jason W. Rigby, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Eric L. Zagar, and J. Daniel Albert, of KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania, *Attorneys for Joseph Lawrence Ligos.*

William B. Chandler III, Brad D. Sorrels, Daniyal M. Iqbal, and Nora M. Crawford, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; OF COUNSEL: Steven Guggenheim, of WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California, *Attorneys for Defendants Max Pridgeon, Asaf Yarkoni, and Nir Hasson.*

S. Mark Hurd and Miranda Gilbert, of MORRIS NICHOLS ARSHT & TUNNEL, LLP, Wilmington, Delaware; OF COUNSEL: Danny David and Amy Pharr Hefley, of BAKER BOTTS L.L.P., Houston, Texas, *Attorneys for Defendant Haim Tsuff.*

**GLASSCOCK, Vice Chancellor**

In 2019, Isramco Inc., a Delaware corporation ("Isramco") was acquired by former Defendant Naphtha Israel Petroleum Corporation Ltd. and its affiliates (collectively, "Naphtha"). All entities on both sides of the transaction were indirectly controlled by Defendant Haim Tsuff.

The Plaintiff, Joseph Ligos, was an Isramco stockholder squeezed out in the merger. He contends that the transaction was not fair to the minority stockholders. He brought this action against, among others, Tsuff and the Defendant directors of Isramco who comprised a special committee that negotiated the transaction (collectively, the "Special Committee Defendants").

Isramco attempted to fit the transaction under the *MFW*[1] rubric, to qualify for application of the business judgment rule. Tsuff and the Special Committee Defendants, accordingly, moved to dismiss. In a memorandum opinion ("*Ligos I*"),[2] I found that, although a majority of the minority stockholders in Isramco voted in favor of the merger, the facts pled rendered it plausible that the vote was not fully informed:

> The Complaint alleges that a material factor in arriving at a fair value of Isramco was the value of certain overriding royalties in an offshore Israeli oil field, the Tamar Field, in which another entity, Isramco Negev 2 Limited Partnership ("Negev 2") owns a working interest. The value of the royalties, in turn, was dependent on when the right to receive royalties ripened, a matter on which Isramco and Negev 2

---

[1] *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).
[2] *Ligos v. Isramco, Inc.*, 2021 WL 3870679 (Del. Ch. Aug. 31, 2021) [Hereinafter "*Ligos I*"].

1

disagree. The royalty issue was, at the time of the merger, in arbitration. Negev 2 is yet another entity controlled by Tsuff. The value of the royalties, and the value of the arbitration, were material to the deal price.

According to the merger proxy (the "Proxy"), some facts about the arbitration, and the value of the arbitration assigned by the Special Committee's financial advisor, were disclosed to the minority stockholders. Stockholders were told that Naphtha, the merger counterparty, held a controlling interest in Negev 2, which was involved in the arbitration. What they were not told is the following. About the time that Tsuff formed a desire for Naphtha to acquire Isramco, he approached the Isramco board of directors (the "Board") for permission to allow *Tsuff himself* to participate in the arbitration. The Board agreed. Under the motion to dismiss standard, I must assume that, having received permission of the Board to participate, Tsuff did so, and that he pursued his own, conflicted, self-interest in that arbitration. It is the Plaintiff's theory that Tsuff's self-interest included prolonging the arbitration throughout the merger negotiations to keep Isramco's value artificially reduced. While that matter remains for decision on a record, what I can find at the pleading stage is that both the Board's agreement to allow Tsuff to participate, and the participation itself, would have been material to a stockholder attempting to evaluate the proposed merger. At this pleading stage, this makes business judgment review under *MFW* unavailable.[3]

Having so found, I denied Tsuff's Motion to Dismiss. Still pending, *inter alia*, was the Motion to Dismiss the Special Committee Defendants.[4] For reasons explained below, that motion has remained pending—I address it here. Although the transaction itself must satisfy entire fairness review, the Special Committee Defendants must be dismissed unless the Plaintiff's complaint (the "Complaint")

[3] *Id.* at *2.
[4] Defs. Pridgeon, Yarkoni, and Hasson's Mot. to Dismiss, Dkt. No. 28.

2

states a non-exculpated claim against them. In light of Isramco's exculpation clause, that would require a well-pled claim for breach of the duty of loyalty. I examine the allegations against the Special Committee Defendants below and find that the Motion to Dismiss must be granted.

## I. BACKGROUND[5]

This memorandum opinion deals exclusively with the motion of Max Pridgeon, Asaf Yarkoni, and Nir Hasson (together, the Special Committee Defendants) to dismiss Ligos' claims stemming from Isramco's completed cash-out merger with its controller, Naphtha (the "Merger"). My previous memorandum opinion denying Tsuff's motion to dismiss surveys the notably complex entity structures and Tsuff's role in the transaction.[6] I direct my readers there for facts beyond those required to assess the motion at hand. Though the Plaintiff's claims against Tsuff survived the motion to dismiss, he has not pled sufficient allegations against the Special Committee Defendants to sustain a claim. Specifically, the

---

[5] Unless otherwise noted, the facts referenced in this memorandum opinion are drawn from the Verified Shareholder Class Action Complaint (referred to herein as the "Complaint") and the documents incorporated therein. *See generally* Verified Shareholder Class Action Compl., Dkt. No. 1. I may also consider documents produced by the Defendants in response to the Plaintiff's 8 Del. C. § 220 books and records demand "to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020).
[6] *See Ligos I.*

Plaintiff failed to plead with specificity any facts impeaching the loyalty of the Special Committee Defendants. Even under the plaintiff-friendly inferences applicable, I cannot find it reasonably conceivable that any Special Committee Defendant lacked independence from Tsuff. Although the complaint alleges that these Defendants were selected (presumably by Tsuff) to perform inadequately at their jobs, if true this does not implicate *their* duty of loyalty. There is also no indication that the Special Committee acted in bad faith in the negotiations with Naphtha. Allegations of the bad faith omission of material from the Merger proxy also fail. As no unexculpated claims survive, the Complaint fails to state a claim.

*A. The Parties and Relevant Non-Parties*

Plaintiff Joseph Lawrence Ligos is a former stockholder of Isramco.[7] He continuously owned shares of Isramco stock from the announcement to the consummation of the Merger.[8]

Non-party Isramco is a Delaware corporation headquartered in Houston, Texas.[9] In October 2019, Isramco's controller—Defendant Naphtha—and its affiliates consummated a going-private transaction by purchasing all of Isramco's

---

[7] Compl. ¶ 13.
[8] *Id.*
[9] *Id.* ¶ 14.

4

unaffiliated stock for cash consideration.[10]  Prior to the consummation of the Merger, Isramco was publicly traded on the NASDAQ Capital Market.[11]

Non-party Naphtha Israel Petroleum Corporation Ltd. is an Israeli public company whose securities trade on the Tel Aviv Stock Exchange.[12]  Its principal businesses are exploration and production of oil and natural gas.[13]  That company beneficially owned 70.74% of Isramco's outstanding common stock in September 2019 prior to the Merger.[14]

Defendant Tsuff served as Isramco's President and the Chairman of its Board of Directors (the "Board") from May 1996 until consummation of the Merger on October 25, 2019.[15]  He served as the company's Chief Executive Officer from May 1996 until November 2017, and as Co-Chief Executive Officer from November 2017 until consummation of the Merger in October 2019.[16]  Tsuff serves as the Chairman of Naphtha Israel Petroleum Corporation Ltd.'s board and sits on the boards of several of that company's subsidiaries.[17]  Prior to the Merger, Tsuff owned 61,679 shares of Isramco common stock and, through his interest in Naphtha, indirectly

[10] *Id.* at 1–2, ¶142.
[11] *Id.* ¶ 14.
[12] *Id.* ¶ 21.
[13] *Id.*
[14] *Id.*
[15] *Id.* ¶ 25.
[16] *Id.*
[17] *Id.* ¶¶ 21–24.

5

owned an additional 1,922,517 shares, which collectively totaled approximately 73% of the Isramco's outstanding shares.[18]

Defendant Pridgeon served as a member of the Isramco Board from April 2001 until the closing of the Merger.[19] From 2015 until October 25, 2019, Pridgeon also served as a member of Isramco's two-member Conflict Committee of the Board (the "Conflict Committee").[20] The Board formed the Conflict Committee in 2012 to review related company transactions.[21] Pridgeon was a member of the special committee formed to negotiate on behalf of Isramco in the proposed Merger (the "Special Committee").[22] Prior to serving as a member of the Board, Pridgeon worked as an account manager and export manager for VERNO Holland (1989-1995) and a property acquisitions consultant for M.A. Realistic Estate Netherlands (1996-1999).[23] Tsuff co-owned VERNO Holland during Pridgeon's employment and has served as a director of M.A. Realistic Estate Netherlands.[24] Thus, for nine or ten years ending in 1999, Pridgeon's primary employment was with Tsuff-related entities. However, his primary employment after the turn of the century was not alleged in the Complaint.

---

[18] *Id.* ¶ 15.
[19] *Id.* ¶ 29.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

6

Defendant Yarkoni served as a member of the Board from December 2010 until the closing of the Merger on October 25, 2019.[25] Yarkoni also served as a member of the Conflict Committee from 2012 to October 25, 2019 and as a member of the Special Committee.[26] Yarkoni's employment history and his employment outside of the directorship went undiscussed in the Complaint.

Defendant Hasson served as a member of the Board from August 2014 until the closing of the Merger on October 25, 2019.[27] He also served as a member of the Special Committee.[28] Hasson's employment history and his employment outside of the directorship were likewise not discussed in the Complaint.

### B. Factual Background

Following Naphtha's May 24, 2018 letter to the Isramco Board indicating an interest in taking Isramco private, the Board met on June 5, 2018 and appointed the Special Committee.[29] The board empowered that committee, composed of Pridgeon, Yarkoni, and Hasson, to "'review, evaluate and negotiate the terms of any Possible Transaction.'"[30] The reader will no doubt find the following factual recitation to be

---

[25] *Id.* ¶ 30.
[26] *Id.*
[27] *Id.* ¶ 32.
[28] *Id.*
[29] *Id.* ¶¶ 81, 84.
[30] *Id.* ¶¶ 84, 86.

wearisome; it serves, nonetheless, to show the active nature of the Special Committee's involvement in the negotiations.

From August 2018 to October 5, 2018 the Special Committee reviewed prospective financial advisors and chose Duff & Phelps.[31] The Special Committee requested a report on the value of Isramco and Duff & Phelps submitted that report on November 26, 2018.[32]

On January 8, 2019, Naphtha proposed a price of $110.36 per share (the "January Proposal").[33] Despite being 7% lower than Isramco's same day trading price of $118.65,[34] Naphtha stated that the offer was fair considering the costs associated with remaining a public company and the limited liquidity available.[35] Two days after the January Proposal during a Special Committee meeting, Duff & Phelps made an initial valuation presentation, which noted that the proposed premium fell below those in similar take-private transactions.[36] On January 14, 2019, the Special Committee's legal counsel, Norton Rose Fulbright US, LLP ("Norton Rose"), requested additional information from Naphtha to aid Duff & Phelps's assessment.[37]

---

[31] *Id.* ¶ 87.
[32] *Id.* ¶ 88.
[33] *Id.* ¶ 91.
[34] *Id.*
[35] *Id.* ¶ 92.
[36] *Id.* ¶ 93.
[37] *Id.* ¶ 94.

On January 27, 2019, the Special Committee held a meeting at which it discussed valuation with Duff & Phelps.[38] One concern was the value to the company of an arbitration concerning royalties owed to Isramco by Tsuff-controlled entity Isramco Negev 2 Limited Partnership ("Negev 2") for production in the Tamar Field (the "Tamar Arbitration"). Isramco's interest in revenues from this gas field was the company's primary source of revenue and it was slated to increase after a "Payout Date" of disputed interpretation.[39] Once the value of the Tamar Arbitration was factored in, Naphtha's January Proposal of $110.36 fell below the $125.52 to $151.24 per share valuation yielded by Duff & Phelps' analysis.[40] The Special Committee "'asked Duff & Phelps to clarify their issues and questions with Naphtha . . . for their continued analysis.'"[41] Duff & Phelps did so on January 24, 2019 and received responses from Naphtha January 28, 2019.[42] The Special Committee, Norton Rose, and Duff & Phelps held a call with representatives of Naphtha where they discussed Naphtha's presentation, its answers to Duff & Phelps questions, the Tamar Arbitration, projections of the Tamar Field's production, and similarly situated companies.[43]

---

[38] *Id.* ¶ 99.
[39] *Id.* ¶¶ 42–45, 56–63.
[40] *Id.* ¶ 99.
[41] *Id.* ¶ 104.
[42] *Id.*
[43] *Id.* ¶ 105.

The Special Committee met on January 31, 2019 and discussed potential responses to Naphtha's January Proposal.[44] It determined that Duff & Phelps should seek further information from Naphtha.[45]

The Special Committee retained Israeli firm Pearl Cohen Zedek Latzer Baratz LLP ("Pearl Cohen").[46] On February 11, 2019, it held a meeting attended by Perl Cohen and Gornitzky & Co.—Isramco's counsel in the Tamar Arbitration.[47] Perl Cohen was to assess Gornizky's analysis of the Tamar Arbitration.[48] Two days later, on February 13, 2019, at another Special Committee meeting, Perl Cohen delivered its results stating that it was largely or wholly in agreement with Gornitzky's analysis, the results of which were undisclosed.[49]

On February 17, 2019, Duff & Phelps presented its updated valuation and analysis to the Special Committee.[50] Duff & Phelps valued Isramco at $134.82 to $171.24 per share.[51] However, these figures included a step up in basis, "the depreciation of which has the effect of reducing income taxes each year."[52] Absent

---

[44] *Id.* ¶ 106.
[45] *Id.*
[46] *Id.* ¶¶ 106, 109.
[47] *Id.*
[48] *Id.* ¶ 109.
[49] *Id.* ¶¶ 109, 141.
[50] *Id.* ¶ 110.
[51] *Id.*
[52] *Id.* ¶ 111 (internal quotations omitted).

this preferential tax treatment, Duff & Phelps valued Isramco's shares between $124.14 and $152.48 per share.[53]

Armed with this valuation, the Special Committee met on February 21, 2019 and decided that Duff & Phelps should relay a counterproposal of $145.00 per share to Naphtha.[54] On February 27, 2019, the Special Committee accompanied by advisors Norton Rose and Duff & Phelps met with Naphtha and its legal advisor, Baker Botts LLP ("Baker Botts").[55] The next day, Baker Botts asked Duff & Phelps to reexamine its "'step up analysis to net out the taxes payable by a seller in a sale,'" and to explain how it came to its cost of capital.[56] Duff & Phelps responded on March 7, 2019 with a list of comparable companies, as well as its country risk premium, and relayed the Special Committee's view that there were structures available to Naphtha to avoid or substantially avoid negative tax treatment.[57]

On March 11, 2019, Baker Botts requested an in-person negotiation and sent Duff & Phelps an Israeli tax ruling purportedly holding that "'full capital gains'" would be assessed in any sale of the equity or interest in the Tamar Royalties.[58] The Special Committee met with Duff & Phelps on March 13, 2019 and they discussed

---

[53] *Id.* ¶ 112.
[54] *Id.* ¶ 114.
[55] *Id.* ¶ 117.
[56] *Id.*
[57] *Id.* ¶ 118.
[58] *Id.* ¶ 119.

"key differences between the Special Committee's and Naphtha's valuations."[59] After taking into account the potential Tamar Arbitration proceeds, Duff & Phelps valued the shares at $121.00 to $146.00 per share.[60] At the Special Committee's direction, Duff & Phelps emailed Naphtha and Baker Botts reaffirming their unchanged position on valuation, acknowledging Naphtha's views on tax treatment, and noting that they came to a valuation absent a step up in basis.[61] The email dismissed the potential for face-to-face negotiations stating that negotiations would be unsuccessful given Naphtha's low proposal.[62]

Despite the Special Committee's rebuke, on March 19, 2019, Baker Botts reiterated Naphtha's belief in face-to-face negotiations as the most efficient means to an agreement on valuation.[63] Pridgeon responded on behalf of the Special Committee stating that it was "eager to obtain a quick agreement on an adequate price" but that "Naphtha's starting price of $110" was "far from what our financial advisor can provide a Minimum fairness opinion on."[64] Naphtha in turn increased its offer to $115.00 per share.[65] Naphtha also restated its request for an in person

---

[59] *Id.* ¶ 120.
[60] *Id.*
[61] *Id.* ¶ 122.
[62] *Id.*
[63] *Id.* ¶ 123.
[64] *Id.* ¶ 126.
[65] *Id.* ¶ 127.

meeting to help it understand the Special Committee's valuation and noted that the alternative was no deal.[66]

On March 25, 2019, the Special Committee stated that it had no reason to alter its $145 starting point but that it would meet in person.[67] It further stated that starting discussions below $120.00 per share would make a deal unlikely.[68]

The first day of the in-person meeting took place April 3, 2019.[69] Naphtha representatives presented their valuation analysis reiterating Naphtha's positions on the tax benefits of the transaction and the appropriate discount rate.[70] Duff & Phelps gave their own presentation on their analysis of the valuation of Isramco, which suggested a value of $140.00 per share.[71]

On the second day of in-person negotiation Naphtha increased its offer to $121.40 per share but noted that this was its best and final offer and, if not timely accepted, it could be withdrawn.[72] Naphtha noted the significant market uncertainties created by the transaction itself.[73] It further noted new adverse

---

[66] *Id.*
[67] *Id.* ¶ 128.
[68] *Id.* ¶ 129 ("'We are concerned that starting direct discussions below the level our financial advisor indicated to your legal counsel last week of $120 per share makes it less likely that we ever get to . . . an adequate price for us to endorse.'").
[69] *Id.* ¶ 131.
[70] *Id.*
[71] *Id.* ¶ 135.
[72] *Id.* ¶¶ 136–37.
[73] *Id.*

developments such as the loss of the bid for sales of gas to Israel Electric Corporation and the Jordanian Parliament's call to terminate contracts for Leviathan field gas.[74] After excusing itself and its advisors to consider the offer in private, the Special Committee returned to the meeting and accepted the proposal.[75]

Duff & Phelps presented its favorable fairness opinion to the Special Committee in May 2019.[76] The Plaintiff contends that this opinion was flawed.[77] A majority of unaffiliated Isramco stockholders voted to approve the buyout on October 22, 2019.[78] The Plaintiff contends, and at the pleading stage I found it reasonable to infer,[79] that the proxy contained material misrepresentations and that the vote was therefore uninformed.[80]

*C. Procedural History*

The Plaintiff filed his complaint June 4, 2020.[81] The Complaint alleges that Tsuff, Naphtha Israel Petroleum Corporation Ltd., Naphtha Holding LTD. ("NHL"), I.O.C. – Israel Oil Company, LTD. ("I.O.C."), Naphtha US Oil, Inc. ("US Oil"),

---

[74] *Id.* ¶ 136.
[75] *Id.* ¶ 138.
[76] *Id.* ¶ 141.
[77] *Id.*
[78] *Id.* ¶ 142.
[79] *Ligos I* at *9.
[80] Compl. ¶¶ 142–44.
[81] *See* Compl.

14

United Kingsway Ltd. ("Kingsway"), YHK Investment L.P. ("YHK"), YHK General Manager Ltd. ("YHK Manager"), Equital, Ltd. ("Equital"), and J.O.E.L Jerusalem Oil Exploration Ltd. ("JOEL") breached their fiduciary duty and were unjustly enriched (Counts I and III), Tsuff, Joseph From, Frans Sluiter, and the Special Committee Defendants breached their fiduciary duty (Count II), Negev 2 aided breaches of fiduciary duty (Count IV), and Kingsway, YHK, YHK Manager, Equital, JOEL, Naphtha Israel Petroleum Corporation Ltd., I.O.C., and US Oil aided breaches of fiduciary duty (Count V).[82] On August 5, 2020, the Plaintiff dismissed his claims against JOEL, Equital, YHK, YHK Manager, and Kingsway without prejudice.[83]

On September 21, 2020, three groups of defendants filed separate motions to dismiss: (i) Naphtha Israel Petroleum Corporation Ltd., NHL, I.O.C., US Oil, and Tsuff;[84] (ii) From, Sluiter, and Isramco (the "Isramco Motion");[85] and (iii) Pridgeon, Yarkoni, and Hasson.[86] Negev 2 moved to dismiss on December 14, 2020.[87] The parties completed briefing these motions by February 26, 2021.[88] I heard oral

---

[82] *Id.* ¶¶ 159–87.
[83] Notice of Voluntary Dismissal as to Certain Defs., Dkt. No. 10.
[84] Mot. to Dismiss of Defs. Naphtha, Holdings, I.O.C., US Oil, and Tsuff, Dkt. No. 23.
[85] Defs. From, Sluiter, and Isramco's Mot. to Dismiss, Dkt. No. 26.
[86] Defs. Pridgeon, Yarkoni, and Hasson's Mot. to Dismiss, Dkt. No. 28.
[87] Def. Isramco Negev 2 LP's Mot. to Dismiss, Dkt. No. 39.
[88] *See* Reply Br. in Supp. Mot. to Dismiss of Def. Isramco Negev 2 LP, Dkt. No. 54.

argument on all motions on May 21, 2021.[89]  The Plaintiff voluntarily dismissed From, Sluiter, and Isramco on May 26, 2021.[90]  That dismissal mooted the Isramco Motion.  On August 31, 2021, I denied Tsuff's motion to dismiss.[91]  Negotiations ensued.[92]  The Plaintiff voluntarily dismissed Naphtha Israel Petroleum Corporation Ltd., NHL, I.O.C., US Oil, and Negev 2 on March 1, 2022.[93]  On August 12, 2022, the Special Committee Defendants and the Plaintiff informed me that they could not reach an agreement and stated no further argument was necessary for me to rule on the Special Committee Defendants' motion to dismiss.[94]  I consider the matter fully submitted as of that date.

## II. ANALYSIS

### A. Legal Standards

The Defendants seek dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  As such, I take as true all well-pled allegations

---

[89] *See* Tr. of 5.21.21 Oral Arg. on Defs.' Mots. to Dismiss, Dkt. No. 63.

[90] Order of Dismissal with Prejudice as to Certain Defs., Dkt. No. 62.

[91] *See Ligos I.*

[92] Letter to The Honorable Sam Glasscock III from Samuel L. Closic in Advance of Today's Status Conference, Dkt. No. 67.

[93] Order of Dismissal Against Defs. Naphtha, Holdings, I.O.C., Naphtha US Oil, Inc., and Negev 2, Dkt. No. 73.

[94] Office Conference Before Vice Chancellor Sam Glasscock Dated 8.12.22, Dkt. No. 83.

16

and draw all reasonable inferences in the light most favorable to the Plaintiff.[95] However, I may not accept factually unsupported inferences and conclusory statements.[96] While I must accept reasonable inferences logically drawn from the face of the complaint, inferences that require strained interpretation or lie outside the pale of logic need not be accepted.[97] I may grant the motion to dismiss only if I find that it is not "reasonably conceivable" that the plaintiff may prevail.[98]

Under Count II of his Complaint—the only count against the Special Committee Defendants—the Plaintiff asserts that the Special Committee Defendants were controlled, conflicted and operated in bad faith to conduct an "unfair [b]uyout process."[99] Given the foundations of this count, the exculpatory provision in Isramco's Certificate of Incorporation,[100] and the holdings of my prior memorandum

---

[95] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536–37 (Del. 2011).

[96] *In re Lukens Inc. Shareholders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd*, 757 A.2d 1278 (Del. 2000).

[97] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[98] *Cent. Mortg. Co.*, 27 A.3d at 537.

[99] Compl. ¶¶ 162–69.

[100] "On a motion to dismiss, Delaware courts may take judicial notice of the terms of a corporation's governing certificate of incorporation." *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *14 (Del. Ch. Oct. 28, 2013). In accordance with 8 *Del. C.* 102(b)(7), Isramco's Certificate of Incorporation contains the following exculpatory provision, "No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the Delaware General

17

opinion, the appropriate legal standard is that of *In re Cornerstone*.[101]  For the Complaint to survive the Defendants' motion to dismiss, I must find that the Plaintiff has pled a viable, non-exculpated claim against the individual Special Committee Defendants.  In other words, the Complaint must allege a plausible breach of the duty of loyalty in order to survive the motion.  Below, I examine whether the Special Committee Defendants were independent and disinterested before turning to the Plaintiff's allegations of bad faith and the impact of the alleged proxy omissions on the Special Committee Defendants.

A finding that the transaction was *MFW* compliant would have led to the application of the Business Judgement Rule and dismissal of the action.[102]  It is unsurprising, then, that in briefing and at oral argument, the Plaintiff focused primarily on refuting the application of *MFW* cleansing, using the alleged failures and inadequacies of the Special Committee as a tool to maintain the suit and seek review under the entire fairness standard.[103]  That analysis focused on whether the

Corporation law, or (iv) for any transaction from which the director derived an improper personal benefit." Ex. A Opening Br. in Supp. Defs. Joseph From, Frans Sluiter, and Isramco, Inc.'s Mot. to Dismiss Pls.' Verified Shareholder Class Action Compl., Dkt. No. 26.

[101] *See In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015) ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct").

[102] *See M & F Worldwide*, 88 A.3d at 644.

[103] *See* Tr. of 5.21.21 Oral Arg. 51:2–18 ("The defendants don't even make it out of the *MFW* starting gate.  We're missing a fully independent special committee and a committee fully

18

committee was fully functioning and whether the vote of the stockholders was fully informed and uncoerced. The purpose of that review was to ascertain whether the transaction sufficiently replicated an arms-length negotiation to negate entire fairness review—I found that it was reasonable to infer that it did not.[104] The analysis with regard to the motion to dismiss the Special Committee Defendants is necessarily different, however. Here, I focus on the allegations of breach of duty by those Defendants; their interest in the transaction, their independence from Tsuff, and their good faith. As discussed in detail below, I find that the Plaintiff has not met his burden under 12(b)(6).

### B. Independent and Disinterested

The Plaintiff does not assert facts indicating that any of the Special Committee Defendants were interested in the transaction. He does, however, assert that each member of the Special Committee lacked independence from Tsuff.

Directors are presumed to be independent.[105] To carry their burden, a plaintiff must sufficiently plead that a director's ties to the interested party, when judged subjectively, were material such that those ties could have affected that director's

---

empowered to independently reject an offer." "After running through *MFW*, I plan to briefly explain why plaintiff's complaint states claims for nonexculpated breaches of fiduciary duty.").

[104] *Ligos I* at *9.

[105] *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015) (quoting *in re MFW S'holders Litg.*, 67 A.3d 496, 509 (Del. Ch. 2013)).

19

impartiality.[106]   These ties are viewed holistically.[107]   If sufficiently alleged in combination with other facts, a threat of loss of a director's compensation can impeach her loyalty.[108]   However, alone, the fact that a director is compensated does not imply self-interest,[109] and "the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."[110]

Before turning to the directors individually, the Plaintiff argues that Tsuff's position as a controller militates against a finding of independence.  The presence of a controller may raise an inference of lack of independence where the controller will maintain leverage over a special committee defendant post-transaction.[111]   The Plaintiff fails to allege that Tsuff would continue to leverage his position as a controller over the Special Committee Defendants after the Merger, however.  In

---

[106] *M & F Worldwide*, 88 A.3d at 649.

[107] *See In re HomeFed Corp. Stockholder Litig.*, 2020 WL 3960335, at *14 (Del. Ch. July 13, 2020) ("Although the presence of a controller does not alone overcome the presumption of director independence, it is relevant when considering Plaintiffs' allegations holistically.")

[108] *See Cumming on behalf of New Senior Inv. Grp., Inc. v. Edens*, 2018 WL 992877, at *17 (Del. Ch. Feb. 20, 2018) (finding a director to not be independent for demand futility purposes when he received 60% of his publicly reported income from controller appointed board seats and listed his address as the controller's address for SEC investment purposes).

[109] *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 359–60 (Del. Ch. 1998), *aff'd in part*, *rev'd in part and remanded sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[110] *See Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (internal quotations and citations omitted) (analyzing the impact of previous business relationships on director loyalty in a Rule 23.1 context).

[111] *HomeFed*, 2020 WL 3960335, at *14; *See also In re BGC Partners, Inc. Derivative Litigation*, 2019 WL 4745121, at *11–14 (Del. Ch. Sept. 30, 2019) (conducting a similar analysis in a Rule 23.1 context).

fact, the transaction was fatal to these Defendants' directorships; this was an inherent effect of the Merger's approval. Moreover, there are no allegations that these Defendants harbored any expectations of future business dealings with Tsuff. Instead, the Plaintiff alleges that the relationship between the directors and Tsuff was *do ut des*[112] such that *past* dealings conditioned future performance. However, the attenuation of the relationship between each of the Special Committee Defendants and Tsuff, as pled, renders this argument unconvincing.[113]

### 1. Pridgeon

The evidence of a relationship with Tsuff is stronger concerning Pridgeon than is the case for his fellow Defendants. Nonetheless, I find the allegations of lack of independence regarding Pridgeon unconvincing. The Complaint alleges that Pridgeon "worked" for Tsuff-related entities for 30 years.[114] Most of that time represents his tenure on the Isramco board. The Complaint alleges that Pridgeon worked as an employee, rather than as a director, of entities in which Tsuff had an

---

[112] "I give so that you might give."

[113] It is worth noting that, unlike an evaluation of a hypothetical demand in a "demand excused" analysis under Rule 23.1—where the question is whether a director could bring business judgement to bear to *sue* a controller—here the issue is the reasonable conceivability of lack of independence sufficiently profound to imply a breach of duty in negotiating a transaction. *See In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003) ("It is, I daresay, easier to say no to a friend, relative, colleague, or boss who seeks assent for an act (e.g., a transaction) that has not yet occurred than it would be to cause a corporation to sue that person.").

[114] Compl. ¶ 29.

interest as a part-owner or director from 1989 to 1999.[115]  Plaintiff fails to allege any relationship beyond employer-employee tenure at these jobs.

Pridgeon's employment after the turn of the century is not addressed in the Complaint, and if Pridgeon's board service after that time provided a material benefit to him, that is similarly unalleged. All the Complaint alleges with specificity is that Pridgeon is a long-time director, and that during and before the Clinton administration, he was an employee of entities in which Tsuff had an interest.  The Complaint also alleges that during his board tenure, Pridgeon voted in favor of transactions advocated by, and allegedly beneficial to, Tsuff.  The pleadings are insufficient to imply that either his service on the board, or his pre-millenial employment, would cause him to breach his duty of loyalty in the transaction at issue.  Further, his votes as a director, as alleged, do not raise a reasonable inference that he would disloyally negotiate on behalf of Isramco to benefit Tsuff.[116]  I find

---

[115] *Id.*

[116] The complaint alleges that Pridgeon, as a director of Isramco, approved loans to Isramco from other Tsuff affiliates in the first decade of the twenty-first century that were at "usurios" rates, but omits details from which I may infer that, under the circumstances, approval of the loans demonstrates either a breach of duty to Isramco or a lack of independence from Tsuff on the part of Pridgeon.  *Id.* ¶ 53.  Similarly, Pridgeon voted in favor of a consulting agreement in 2008, extended in 2014, with Goodrich Global L.T.D. B.V.I.; an entity that the Plaintiff avers upon "information and belief" is Tsuff-related.  *Id.*  The Complaint suggests the terms of the agreement were "rich," but again fails to make non-conclusory allegations from which I may infer that the decision to vote for the agreement was against the interest of Isramco or otherwise indicative of a lack of independence on Pridgeon's part.  Ditto regarding allegations relating to a long-ago (1997–2000) transaction involving a joint drilling venture offshore of the Republic of Congo, and an ill-fated 2004 investment in a "luxury cruise liner."  *Id.*  I do not mean to imply that well-pled

22

the Complaint insufficient to state a breach of Pridgeon's duty of loyalty, even at this pleading stage.

### 2. Yarkoni

The Complaint's allegations concerning Yarkoni's lack of independence are weaker than those against Pridgeon. They similarly fail to impugn Yarkoni's loyalty. The Complaint alleges that Yarkoni is not independent because he served on Isramco's board from 2012 until the Merger and, as a member of the conflicts committee, approved previous Tsuff proposed transactions.[117] This is a conclusory assertion; the complaint fails to allege any beneficial relationship or material benefit running from Tsuff to Yarkoni.

Further, the Plaintiff avers that Yarkoni "lacked the industry-specific background and experience necessary to negotiate the acquisition or to push back on questionable risk factors and other assumptions presented by Naphtha."[118] Although Yarkoni's alleged lack of skills arguably could indict the fairness of the Merger process, it does not impugn his independence (or otherwise imply disloyalty).

---

allegations of contemporary transactions in which a controller dominated supposedly independent directors are without value in an analysis of independence of those directors with respect to a transaction at issue. However, the allegations here are unpersuasive.

[117] *Id.* ¶ 30.

[118] *Id.* ¶ 7.

### 3. Hasson

The Complaint's allegations of Hasson's lack of independence are also insufficient. Plaintiff simply avers that Hasson was on Isramco's board[119] and that he lacked the experience to push back against Naphtha.[120] As stated above, the failure to allege any benefits, let alone the materiality of those benefits, is fatal.

### C. Bad Faith

In order to state a claim under *Cornerstone*, where the Complaint fails to support a defendant's lack of independence or demonstrate her self-interest, the Plaintiff must plead with particularity facts that give rise to an inference of bad faith.[121] Attempting to do this, the Plaintiff contends that the Special Committee failed to negotiate vigorously and received bad information from its advisors. As pled, neither of these contentions rise to the level of bad faith.

When applied to corporate fiduciary conduct, bad faith is "intentional dereliction of duty, a conscious disregard for one's responsibilities."[122] Bad faith actions violate the duty of loyalty, and an act of gross negligence is not bad faith.[123]

---

[119] *Id.* ¶ 32.
[120] *Id.* ¶ 7.
[121] *See Cornerstone*, 115 A.3d at 1179–80.
[122] *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).
[123] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64–65 (Del. 2006).

Thus, at the motion to dismiss stage, a plaintiff must plead "facts that support a rational inference of bad faith."[124] To do this, plaintiffs may plead "either [1] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [2] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[125] That is, the facts must be sufficiently egregious that, despite lack of self-interest or dependance on any interested party, a court may find it reasonably conceivable that the fiduciary was acting against the interest of the entity. This is necessarily a difficult burden to carry: "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[126] Put another way, an inference of bad faith does not arise merely from a director's allegedly deficient performance.

Though the *result* of the Special Committee's performance, as pled, may not be excellent, the Special Committee acted vigorously, and negotiated a higher price than initially offered. It hired (and relied on) advisors—one financial advisor and two law firms—engaged in a protracted negotiation process—more than four

---

[124] *Goldstein v. Denner*, 2022 WL 1671006, at *2 (Del. Ch. May 26, 2022) (citing *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 (Del. 2018) (TABLE)).
[125] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (citations omitted).
[126] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

months—and showed a willingness to walk away if the Committee's terms were not met. Plaintiff has failed to allege facts redolent, to my nose, of bad faith.

Plaintiff points to the fact that the Isramco board of directors permitted Tsuff to participate in the Tamar Arbitration, which affected an Isramco asset and with respect to which Tsuff was conflicted. This action was not a part of the Merger itself, nor does it relate to the service of these Defendants on the Special Committee. Further, the fact that the Isramco board permitted Tsuff to "participate"[127] is insufficient to invoke bad faith. The mere participation by a knowledgeable, if conflicted, principal in the arbitration process is not so inexplicable as to imply that the directors were acting outside the interest of Isramco.

The other allegations regarding the Special Committee Defendants' supposed bad faith reflect nothing more than questionable negotiating tactics. First, the Plaintiff objects to the Committee's disclosure of a price "floor."[128] As pled, the disclosure occurred in an email stating, "[w]e are concerned that starting direct discussions below the level our financial advisor indicated to your legal counsel last week of $120 per share makes it less likely that we ever get to . . . an adequate price for us to endorse."[129] This email states that $120 was necessary to, but not sufficient

---

[127] The Complaint does not allege that Tsuff actually took any part in the arbitration.
[128] Compl. ¶ 129.
[129] *Id.*

26

for, a deal. Even with the plaintiff friendly inferences of a motion to dismiss, the negotiation strategy of setting a lower limit does not rise beyond, perhaps, ineptitude, and does not imply bad faith. Next, the Plaintiff points to a supposedly "rapid" acceptance of Naphtha's final offer, and the failure to investigate Naphtha-posited risks to Isramco's business,[130] as inexplicable actions that sustain an inference of bad faith.[131] The facts pled do not support such an inference here. At the *second day* of face-to-face negotiations, Naphtha increased its offer for Isramco to $121.40 per share.[132] Naphtha noted that this offer was both its best and final, and could be revoked at any time. Naphtha also highlighted the market uncertainties plaguing the sector and the transaction. The Special Committee made their decision under a ticking clock of unknown duration. Further, the alleged facts suggest that the Special Committee had been considering the possibility of such a final offer for some time. Finally, the Special Committee did not accept the offer on the spot, they left negotiations to consider the offer with their advisors before agreeing. These facts, to my mind, do not imply bad faith.

---

[130] *Id.* ¶¶ 131–40.

[131] The Complaint also conclusory alleged that the price was so inadequate that it could only have been the result of bad faith. However, the Plaintiff failed to respond to the Special Committee Defendants' briefing on this issue and has thus waived the argument. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[132] Compl. ¶ 136.

Lastly, with regard to the supposed "failure to investigate" Naphtha's assertion of business risk faced by Isramco, the Complaint alleges that the Special Committee did not probe the "accuracy of Naphtha's negotiating positions . . . [and] simply requested that Naphtha represent that Naphtha had provided information in good faith and was not aware of any facts that would reasonably support a higher value for Isramco."[133]  Again, this was not an aggressive negotiation tactic, but it is explicable other than as bad faith.

In other words, the Plaintiff is dissatisfied by the vigor and wisdom of the Special Committee Defendants, but has failed to allege facts raising a reasonable inference of bad faith in the negotiation.

### D. Proxy Omissions

The Complaint alleges that the proxy sent to shareholders to inform their Merger vote was materially misleading.  These proxy defects were fatal to Tsuff's motion to dismiss—denied in *Ligos I*—as they undermined the second MFW factor; an uncoerced, informed majority vote of the minority stockholders.[134]  The analysis here is, once again, different.  I must determine whether the allegations of misleading

---

[133] *Id.* ¶ 140.
[134] *Ligos I* at *9.

28

omissions in the proxy make it reasonably conceivable that the Special Committee Directors acted in regard to the proxy with scienter.

"Bad faith, in the context of omissions, requires that the omission be intentional and constitute more than an error of judgment or gross negligence."[135] A finding of bad faith based on omission alone requires that the omitted disclosures were so facially apparent and so clearly insufficient that they are inexplicable other than as made in bad faith.[136] Unless the facts pled make such an extreme finding reasonably conceivable, I must dismiss.

To my mind, the allegations of the complaint do not give rise to an inference of bad faith. Plaintiff claims that the proxy was misleading because it

> (i) made incomplete partial disclosure of the Special Committee's evaluation of Isramco's prospects in the Tamar Arbitration; (ii) omitted disclosure of (a) Tsuff's participation in the Tamar Arbitration in the months leading up to Naphtha's January Proposal, and (b) material events in the discourse between Isramco and Isramco Negev 2 over the timing of the payout of the Tamar Royalty; and (iii) omitted disclosure of Special Committee Chairman Pridgeon's decades-long employment relationship with Tsuff and his affiliated entities.[137]

In other words, the Complaint alleges that the proxy did not disclose the facts regarding the Tamar Arbitration with sufficient clarity, and omitted Pridgeon's

---

[135] *Morrison v. Berry*, 2019 WL 7369431, at *18 (Del. Ch. Dec. 31, 2019) (citations omitted).
[136] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2017 WL 3172722 at *8 (Del. Ch. July 24, 2017) (quoting *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016)).
[137] Compl. ¶¶ 10, 144.

purported "relationship" with Tsuff. With regard to the latter, I have already found that the Complaint does not adequately allege that Pridgeon was not independent of Tsuff; accordingly, no bad faith inheres in the omission of the "relationship." With respect to the lack of particular disclosures regarding Tsuff's participation in (as well as other details of) the Tamar Arbitration, I determined in *Ligos I* that it was reasonably conceivable that such omission was sufficient to render the resulting stockholder vote uninformed for purpose of *MFW* review. That Tsuff entities were interested in both sides of that arbitration was disclosed, however. The Tamar Arbitration, moreover, was a factor in the valuation of Isramco, no doubt, but it was not a detail of the transaction itself. The omission of the fact that the Isramco board had allowed Tsuff access to the Tamar Arbitration may have been material, but it is not so self-evidently necessary that it implies bad faith on the part of the Special Committee Defendants. Again, having failed to sufficiently plead self-interest or lack of independence on the part of these Defendants, the Plaintiff can point to no motive for an intentional omission in the proxy; accordingly, bad faith must be demonstrated (if at all) by the extreme nature of the proxy omission itself. The proxy, I find, is not so deficient as to invoke bad faith, as opposed to inadvertence or negligence. Plaintiffs have failed in their burden to plead bad faith.

30

## III. CONCLUSION

For the foregoing reasons, the Special Committee Defendants' Motion is GRANTED. An Order is attached.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| JOSEPH LAWRENCE LIGOS, Plaintiff, v. HAIM TSUFF, MAX PRIDGEON, ASAF YARKONI, AND NIR HASSON, Defendants. | C.A. No. 2020-0435-SG |

**ORDER GRANTING DEFENDANTS MAX PRIDGEON, ASAF YARKONI, AND NIR HASSON'S MOTION TO DISMISS THE VERIFIED SHAREHOLDER CLASS ACTION COMPLAINT**

WHEREAS, Defendants Max Pridgeon, Asaf Yarkoni, and Nir Hasson, having moved the Court for an order dismissing Plaintiff's Verified Shareholder Class Action Complaint pursuant to Court of Chancery Rule 12(b)(6) (the "Motion to Dismiss");

IT IS HEREBY ORDERED, this 1st day of December, 2022, that the Motion to Dismiss is GRANTED with respect to the above-named defendants only.

/s/ Sam Glasscock III
Vice Chancellor Glasscock